149 So. 679
**MONTGOMERY, Superintendent of Banks, v. FORD et al.**

4 Div. 689.

Supreme Court of Alabama.

May 25, 1933.

Rehearing Denied Sept. 28, 1933.

W. H. Stoddard, of Luverne, and Steiner, Crum & Weil, of Montgomery, for appellant.

Powell & Hamilton, of Greenville, for appellees.

KNIGHT, Justice.

Bill by H. H. Montgomery, as superintendent of banks, exhibited in the circuit court of Crenshaw county, in equity, against J. C. Ford and others, who were stockholders in the First National Bank of Luverne, and of the Bank of Luverne, prior to, and at the time of, the consolidation and merger of said two banks into the new or merged Bank of Luverne.

The First National Bank of Luverne and the original Bank of Luverne were each doing a banking business in Luverne, Ala., at the time of their consolidation and merger into the new or consolidated Bank of Luverne. As its name implied, the first named bank was a national banking institution, while the latter was a state bank, organized under the banking laws of the state of Alabama.

It is made to appear from the bill that these two institutions deemed it desirable to consolidate and merge their business enterprises into one institution, under the charter of the then existing Bank of Luverne. To accomplish this common purpose, separate meetings of the stockholders of the respective institutions were called and held on the 9th day of September, 1930, at which mutual and reciprocal resolutions were adopted to carry into execution the merger scheme.

The resolutions and plan of consolidation contemplated and provided that the newly created or formed Bank of Luverne should have a paid-in capital stock of $50,000—the amount of the capital stock of the original Bank of Luverne—and a surplus of $30,000. It was further provided that the stockholders of the old Bank of Luverne "should have and own thirty thousand dollars of the stock of the Bank of Luverne, when merged," being three-fifths of said stock; that, for said $30,000 of said stock, $48,000 of the assets of the then Bank of Luverne should be credited as follows: $30,000 to the capital stock of the Bank of Luverne as merged, and $18,000 as surplus. It was also provided that the stockholders of the First National Bank of Luverne "should have and own twenty thousand dollars of the stock of the Bank of Luverne, when merged, being two-fifths of said stock"; that, for said $20,000 of said stock, $32,000 of the assets of the First National Bank should be credited as follows: $20,000 to the capital stock of the Bank of Luverne as merged, and $12,000 to the surplus fund, which was fixed at $30,000.

It was further stipulated and provided that the balance or residue of the assets of the two merging banks should be "credited in the Bank of Luverne, when merged"; that "the said amount so passed to undivided profits shall be first used to take care of any losses or notes or other assets of the Bank of Luverne as merged; said losses to be ascertained by a committee of two from the First National Bank and two from the Bank of Luverne, who shall be designated at present as consisting of Dr. J. C. Ford, T. C. Acree, H. R. Shows and T. W. Shows, Jr. In

the event said committee failed to agree, they may elect a fifth member or refer the matter to the stockholders of the Bank of Luverne as merged. In either event, a majority of the committee or stock present vote will be final."

The resolutions of the stockholders of the original Bank of Luverne further provided:

"That, if the amount passed to individual (undivided) profits from the original surplus and undivided profits of the Bank of Luverne to said Bank of Luverne when merged, are not sufficient to care for any losses, then and in that event, the stockholders of said Bank of Luverne agree to an assessment sufficient to bring their stock to par in said merged bank as well as their pro rata share of a thirty thousand ($30,000.00) dollar surplus.

"In case the losses of the Bank of Luverne are less pro rata than the amount contributed to said merged bank as undivided profits by said Bank of Luverne, then and in that event, same to remain in the said merged bank but to be equalized by the stockholders of both institutions on a pro rata basis."

Similar resolutions, stipulations, and agreement were adopted by the stockholders of the First National Bank.

It was further stipulated by the merging banks that the Bank of Luverne as merged should take over all the assets of the two banks and assume all their liabilities.

The bill avers that the amount passed to the undivided profits in the merged Bank of Luverne by the Bank of Luverne was not sufficient to take care of the losses, and that the stockholders of the said Bank of Luverne thereby became and are liable for an amount sufficient to bring their stock to par in the said merged institutions, as well as their pro rata share of the $30,000 surplus, pursuant to the terms of said resolution and agreement, so adopted by the stockholders of said Bank of Luverne.

Similar averments are made as to insufficiency of designated assets in the undivided profits delivered to the merged bank by the First National Bank to take care of the losses, etc.

The bill avers that "no assessment or ascertainment of the losses was made by any committee under either of said resolutions, and that said committee never attempted to function, and complainant cannot definitely state the amount of the loss and damage to said Bank of Luverne under the said resolutions, but he avers that it will exceed the sum of to-wit, thirty-five thousand dollars; that the account, claims and demands of the respective institutions are exceedingly intricate and complicated, and it will be necessary that the matter be referred to the register or some other proper and suitable person to take and state an account between the two institutions under and pursuant to the terms of said resolutions, to the end that the correct amount of the loss and damage so suffered and sustained by the Bank of Luverne may be ascertained."

It further appears that, after the Bank of Luverne was thus created and organized by the consolidation of the two banks on September 9, 1930, it had only a short career, going into the hands of the complainant, as superintendent of banks, for liquidation purposes on February 12, 1931, and that it was at the time it was placed in the hands of the complainant, and still is, insolvent, and that its assets will be wholly insufficient to pay the depositors and creditors of the bank.

The bill prays, among other things, that upon final hearing the court will enter a decree against the stockholders of the respective institutions or each or either of them that may be found liable in the premises for such loss or damage as the said Bank of Luverne may have suffered or sustained, and for which, under the terms of said respective resolutions, they may be liable, collectively or individually, and for general relief.

The respondents demurred to the bill, assigning the one ground, viz., there is no equity in the bill.

The court sustained the demurrer, and from that decree the present appeal is prosecuted.

The purpose of the bill is to carry into effect the agreement evidenced by the resolutions adopted by the stockholders of the two merging banks, and which, no doubt, formed one of the controlling inducements to the consolidation.

The bill is entirely silent as to what action the state banking department took in the matter of the consolidation, and nothing is said with reference thereto in briefs on either side. We will assume, for the purpose of this decision, that the consolidation was validly effected, and this we may assume, we take it, from the averments that the two banks did "consolidate or merge under the name and style of the Bank of Luverne," and, as consolidated, continued to operate until on or about February 12, 1931.

Appellees' contentions that there is no equity in the bill may be stated: (a) The agreement to submit to an assessment to take care of the named losses was essentially an agreement between the two merging banks and their stockholders, and suit, if any, for a violation of the agreement could be maintained only by the bank, or its stockholders, against the other bank, or its stockholders, who may have violated the terms of the agreement; (b) the agreement as to assessment was dependent upon the finding of the committee, or stockholders, whose decision was to be final. This being true, the insistence is, the

complainant is without power or authority through the courts to have the losses ascertained or to fix an assessment against the stockholders of the old banks; and (c) that neither the consolidated Bank of Luverne nor the superintendent of banks is possessed of authority, under the agreement for consolidation, to maintain the present bill to enforce the demands claimed in the present litigation.

The case confessedly must hinge, in some measure, upon a proper construction of the terms of the agreement of the stockholders of the merging banks.

If the construction placed upon the agreement by counsel for appellees is a proper one, that is, if it was simply an agreement between the stockholders of the two merging banks, to maintain among themselves equality of contribution to the capital stock and surplus of the new bank, and not an agreement running to, and for the benefit of, the merged bank, its depositors and creditors, there is force in the contention made by appellees that the superintendent of banks has no such interest in the enforcement of the demands that may have arisen between the parties, as will authorize him to maintain the present bill. It would be wholly without equity.

But was the agreement primarily for the benefit of the stockholders only, and as between themselves; and not for the benefit of the new bank? The averments of the bill, taken in connection with the conduct and action of the parties, in entering into the merger agreement, it would seem, leave no room to doubt that the primary purpose of the stockholders of the two merging banks was to organize, by the merger, a banking institution with sufficient capital to meet the requirements of the situation, and to that end it was determined that the bank when organized should have, at all events, a working capital stock of $50,000, and an actual surplus of $30,000. We are authorized to infer that this was the mind of both sets of stockholders. We are further authorized to infer that the merged bank could well have relied upon this agreement as one of the reserved assets of the institution.

The merged bank was authorized to, and no doubt did, take over all the assets of the two banks, and did assume all of the liabilities of the two institutions. One of the provisions of the resolutions for the merger was that the "capital stock of the Bank of Luverne, after said merger and consolidation, shall be fifty thousand dollars, the same as it now is, with a surplus of thirty thousand dollars," of which amount the original Bank of Luverne was to furnish $48,000, and the First National Bank $32,000. And, coupled with this stipulation, the further provision was added, viz., that, if the amount passed to the undivided profits from the surplus and undivided profits of the two banks when merged were not sufficient to care for any losses, then and in that event the stockholders of the two banks agreed to an assessment sufficient to bring their respective stock to par in said merged bank, as well as make good their respective pro rata share of the $30,000 surplus.

■ It is earnestly insisted that the merger agreement was for the exclusive benefit of the stockholders of the two merging banks and of the two banks, and in no sense an agreement with the merged bank; that for a violation of this agreement the two banks and their respective stockholders would have their right of action against the offending bank and its stockholders; that the merger agreement may be likened to the terms and provisions of a partnership agreement in which the partners agree to contribute equal amounts to the capital stock of the partnership and one of them fails to contribute his share, or the full amount of it; that in such a case an action would lie in favor of the other party to enforce the agreement against the offending partner, or to recover the amount agreed to be paid, but not the partnership.

We cannot see that the two cases are similar. The consolidated bank must be treated as a new corporation, the constituent corporations being dissolved, and the rights and liabilities of the new stockholders, except as limited and controlled by statute, are determined by their relation to the new corporation. Jackson, Supt. of Banks, v. Ariton Banking Co., 214 Ala. 483, 108 So. 359, 45 A. L. R. 1026.

■ Upon the surrender of the assets of the old corporations to the new corporation, the stockholders of the old corporation were to receive a certain amount of stock, which was coupled with the agreement to make good the par value of the stock in event of certain losses. Can it be said that this agreement to make good was not one of the inducements to the new corporation to set aside to the stockholders the amount of stock allotted to each of the merging banks? The agreement for the issuance of the designated amount of stock to the two sets of stockholders provided, within its terms, for the assessment.

The very fact that the new bank, organized on September 9, 1930, by the merger of the two institutions, with a supposed capital stock of $50,000, and a supposed surplus of $30,000, floundered upon the rocks, and was insolvent on February 12, 1931—just five months after its organization—affords an inference of the further fact that the supposed capital stock, as well as the reputed surplus, were in fact largely fictitious, or, to say the least of it, the inference is fairly deducible that the real value of the stock had not been determined prior to the merger. This

was no doubt responsible for the precaution taken in providing for the assessment, and that provision was not, as contended by appellees, for the benefit of the stockholders inter sese solely, but for the real benefit and protection of the new bank, its depositors and creditors, to the end that the capital stock of the new bank should have a real value of 100 cents on the dollar. If the consolidated bank did not get full value for its stock issued as fully paid, the creditors, now represented by the superintendent of banks, have the right to require the stockholders to make good any deficit. Jackson v. Ariton Banking Co., 214 Ala. 483, 108 So. 359, 45 A. L. R. 1026.

We entertain no sort of doubt but that the merged Bank of Luverne would have been entitled, upon finding the amount passed to the undivided profits from the original surplus and undivided profits of the original Bank of Luverne was insufficient to care for the losses, to require the stockholders of the original Bank of Luverne to pay a sufficient amount to bring their stock to par in the merged bank, as well as make good their pro rata share of the $30,000 surplus. And it could enforce the same right against the stockholders of the First National Bank.

Section 6306 of the Code provides: "Upon taking possession of any of the property and business of any bank or individual banker, the superintendent may collect moneys due to such corporation or individual banker and do such other acts as are necessary to conserve its assets and business, and shall proceed to liquidate the affairs thereof as hereinafter provided. The superintendent shall collect all debts due and claims belonging to the bank."

Under the law, the superintendent of banks had the right to take over the properties and assets of state banks in forced liquidation, and as such is entitled to the possession of the properties of such banks, and has the right to liquidate the same for the benefit of creditors. Rainer Lumber Co. et al. v. Hicks, 224 Ala. 138, 138 So. 830; Green, Supt. of Banks, v. Smith et al., 221 Ala. 484, 129 So. 92; Montgomery, Supt. of Banks, v. Chemical Nat. Bank of New York, 209 Ala. 585, 96 So. 898.

Therefore, if the agreement brought forward in this case was made for the benefit of the merged Bank of Luverne, and it could have maintained a suit thereon, it would follow that the superintendent of banks can maintain the suit. Authorities supra.

It is next insisted by the appellees that the losses on notes or other assets transferred by the two banks to the merged bank were to be ascertained by a committee named in the resolutions, and that the agreement as to assessment was dependent upon the finding of the committee or stockholders, whose decision was to be final; that, inasmuch as there had been no action by the committee, the complainant was "without power or authority through the courts to have the losses ascertained, or to fix an assessment against the stockholders of the old bank."

We are quite aware of the fact that this court has held that an executory contract, for the sale of property, by the terms of which the price to be paid for the whole subject-matter is to be determined by appraisers to be selected directly or indirectly by the parties, cannot be specifically enforced, so long as there is a failure from any cause to appoint the referees to assess the value, City of Anniston v. Alabama Water Co., 207 Ala. 497, 93 So. 409, 410, but this is not a case for specific performance.

In the Anniston Case, supra, which was a case for specific performance, this court held, however: "That, as the contract fixed the price for the plant, or system, the fixation of the value of the improvements and extensions was a mere subsidiary to the main object of the contract, and when the arbitrators did not act, or failed to fix the value, the chancery court should not declare such a failure a fatal defect to the contract, but should, in a suit for specific performance, direct a fair and reasonable value to be ascertained in some manner preliminary to the decree, either by referring the matter to a master or other officer, or by appointing a skilled person as a special valuer, or by determining the amount itself. Pomeroy on Contracts (2d Ed.) § 151, and note."

In the instant case, the ascertainment of the losses, at best, was but a mere subsidiary to the main object of the resolutions, and agreement therein contained. And we see no reason why a court of equity cannot by proper decree provide for the ascertainment of the losses. Certain it is that, if the assets delivered over to the new bank were insufficient to pay in full for the stock, the creditors acting through the bank could enforce payment of the shortage in a proper action, whether there was or was not an agreement to that effect. Jackson, Supt. of Banks, v. Ariton Banking Co., supra.

As we see it, there is nothing in the cases cited by appellee which militates against the above holding. Nor do we think that our conclusion in this case in any wise conflicts with the pronouncement in the case of City of Andalusia v. Alabama Utilities Co., 222 Ala. 689, 691, 133 So. 899. In that case there was an executory contract for the sale of property, by the terms of which the price to be paid for the whole property was to be determined by appraisers. This court very properly held in that case that the contract could not be specifically enforced so long as there was a failure from any cause to appoint referees. The instant case is easily distinguishable from that case.

254

Our conclusion is that the court erred in sustaining the demurrer to the bill. It should have been overruled. A decree will accordingly be here entered overruling the demurrer and reversing the cause.

Reversed, rendered, and remanded.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.